**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| RICHARD NICKLESON, | § | |
| | § | |
| Petitioner, | § | |
| | § | CV. No. C-09-274 |
| v. | § | |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

In 2004, Richard Nickleson was convicted by a jury of murder in Nueces County, Texas and he was sentenced to 38 years imprisonment. Nickleson claims his constitutional rights were violated in a number of ways during his trial. Pending before the Court is Respondent's motion for summary judgment on Nickleson's application for federal writ of habeas corpus. D.E. 8.

The United States Magistrate Judge wrote a detailed Memorandum and Recommendation (M&R) in which she reviewed the evidence and procedural history in detail. D.E. 13. The Court will not repeat that information. The M&R recommends the Court grant Respondent's motion and dismiss Nickleson's claims on their merits. D.E. 13. Nickleson filed objections and also supplemented the Court's record with his State Court Memorandum of

Law. D.E.17. <u>See</u> WR68,461-03, p. 38 (referencing memorandum filed).[1] Thaler did not object to the supplementation.

This Court originally granted Thaler's motion for summary judgment, dismissed Nickleson's motion with prejudice and denied him a certificate of appealability. D.E. 19. The Court then vacated the order and subsequently appointed habeas counsel for Nickleson. D.E. 20, 28.

### NICKLESON'S OBJECTIONS TO THE M&R

Nickleson filed objections to the Magistrate Judge's recommendation that the motion for summary judgment should be granted. His first objection is that there is no evidence that the jury followed the trial court's instruction to disregard the prosecutor's question informing a witness that Richard Nickleson had previously been convicted of a felony. In his second issue, Nickleson complains that the trial court's overruling of counsel's objections of Rule 403 and 404(b) grounds to the evidence that Richard Nickleson gave the decedent a rock of cocaine in exchange for the use of the decedent's car had to be harmful, rather than harmless. Next, Nickleson complains that the evidence was legally insufficient. Finally, Nickleson objects to the M&R's resolution of two of his ineffective assistance of counsel claims.

---

[1] The M&R notes the absence of Nickleson's state habeas memorandum of law. D.E. 13, p. 16. The memorandum is referenced in other records of the state writ. The State did not include the Memorandum in its production of the state court records. Those records were not served on Nickleson (<u>see</u> D.E. 6) such that his first notice of the absence of his memorandum was the M&R.

The Court reviews *de novo* a Magistrate Judge's Memorandum and Recommendation if a party files specific objections within ten days of service. 28 U.S.C. § 636(b)(1).

1. *The trial court's instruction to disregard the prosecutor's question regarding Nickleson's prior felony conviction*

During examination of one of the scene witnesses, the prosecutor asked the witness if she knew that Richard Nickleson had previously been convicted of a felony offense. Defense counsel objected. The trial judge instructed the jury to disregard the prosecutor's statement.

Nickleson claims that the question prejudiced the jury against him. The M&R recommended that this claim be denied on the grounds that the state appellate court held that any prejudice caused by the admission of the evidence of Nickleson's prior conviction was cured by the trial court's instruction and that the State's application of federal law was not contrary to or an unreasonable application of Supreme Court law. M&R at p. 9-11. This Court agrees. The Court overrules Nickleson's objection.

2. *Trial court's admission of evidence that Nickleson traded crack cocaine for use of decedent's vehicle the morning of the shooting*

Trial counsel objected to the admission of evidence at trial that Nickleson traded a rock of crack cocaine to the victim of the shooting for the use of his car the morning of May 25, 2003. The trial court overruled the objection and denied the motion for mistrial that followed outside the presence of the jury. The Court of Appeals held that the trial court did not abuse its discretion in admitting the evidence because the probative value of the evidence, as potential for motive for murder, was not substantially outweighed by the prejudice caused by the evidence. D.E. 13, p. 12. The M&R recommended that summary judgment be granted

3

because Nickleson "produced neither evidence nor argument to support his contention that admission of the evidence regarding the drug transaction substantially swayed the jury or otherwise constituted a denial of fundamental fairness in his trial." Id. Nickleson's objection is overruled.

   3.   *Sufficiency of the evidence*

   The state court of appeals reviewed the sufficiency of the evidence under the familiar Jackson v. Virginia, 443 U.S. 307 (1979), standard. That standard reviews the evidence in the light most favorable to the prosecution and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. Although Nickleson argues that the evidence also supports an inference that some third person shot the victim, that is not the test. Although the evidence of Nickleson's guilt is not overwhelming, there is evidence, as set out in the Court of Appeals' opinion and the M&R, from which a reasonable person could conclude beyond a reasonable doubt that Nickleson shot Martin Sandoval. D.E. 13, pp. 13-15.  Nickleson's objection to the M&R on this issue is overruled.

   Nickleson next objects to the M&R's resolution of two issues of ineffective assistance of counsel relating to the testimony of Lt. Roy Gardner and the prosecutor's closing argument. Because Nickleson's complaints were unclear in the absence of Nickleson's state writ memorandum of law, the M&R recommended that summary judgment be granted. Nickleson filed the memorandum of law. Because this Court now has the benefit of the portion of the record that was not available to the Magistrate Judge, the Court considers Nickleson's claims of ineffective assistance of counsel that are included in that portion of the record.

4

## ADOPTION OF THE M&R IN PART

The Court has reviewed the pleadings, the state court records, including the supplement and the Magistrate Judge's M&R. This Court adopts the Magistrate Judge's findings and conclusions on the following claims, Request for Mistrial, Objection Pursuant to Rules 403, 404(b) of the Texas Rules of Evidence, Sufficiency of the Evidence, and Ineffective Assistance of Counsel as to Juror No. 6.

## MOVANT'S CLAIMS

In his motion for relief pursuant to 28 U.S.C. § 2254, Nickleson claims that his counsel was ineffective during trial and references his state memorandum of law for a full discussion of his claims. D.E. 1, p. 8, D.E. 2, pp. 8, 9 (referencing pp. 6-16 of his state writ). Nickleson claims that counsel was ineffective on the grounds that he did not file a pretrial motion to exclude the hearsay testimony of Lt. Gardner. Nickleson's state memorandum complains that counsel failed to object to misleading and incorrect argument by the State, including the prosecutor's vouching for the state's witness, Lt. Roy Gardner. D.E. 17 at pp. 8-10. Nickleson quoted some of the objectionable portions of the trial testimony and closing argument in his memorandum. The Court finds that Nickleson's factual concerns are specific enough to address, now that the Court has the supplemented record.

## INEFFECTIVE ASSISTANCE OF COUNSEL

**A.    Counsel's Failure to Exclude Testimony of Lt. Gardner**

1. *Factual background*

The Court adopts the M&R's description of events, but expands the discussion of the testimony of Guy Nickleson and Lt. Gardner to address Nickleson's remaining claims. On May 25, 2003, Martin Sandoval was shot around 10 that Sunday morning.  Police officers were looking for Richard Nickleson by noon to question him about the events of that morning. Sometime after noon, Troy Nickleson, Richard Nickleson's uncle, started trying to reach Corpus Christi police officers that he knew from his work. Troy Nickleson worked in the Corpus Christi School District as an Intervention Prevention Specialist working with at-risk students, and previously worked with the school district as an investigating officer and in security. RR 6:13.

After 3:30 p.m. the afternoon of Sunday May 25, 2003, Lt. Gardner returned Troy Nickleson's telephone call and went to the Nickleson house on Peabody in Corpus Christi, Texas. Richard Nickleson was there. After advising Richard Nickleson of his <u>Miranda</u> rights, Lt. Gardner took him to the Corpus Christi Police Department. He was released later that night. Richard Nickleson was arrested several days later.

At trial, the prosecutor called Guy Nickleson to the witness stand towards the end of the first day of the two day trial. RR 6:253. The questioning on direct was as follows:

> A. My name is Guy Nickleson.
> Q. Okay. Mr. Nickleson, what is your relationship to
> the Defendant in this case, Richard Nickleson?

6

A. I'm his uncle.

Q. Okay. Are you familiar with the events that happened
on May 25 of 2003?

A. Yes, I am.

Q. Okay. Let me ask you this, was there a time that you
made contact with an Officer Gardner regarding your brother, I
mean, your nephew, Richard Nickleson?

A. Yes, when he came over to my mother's house on that
day.

Q. Okay. You wanted to have Officer Gardner deal with
your nephew, is that correct?

A. My mother had asked if we knew an officer that would
come and -- Well, what happened was we had two investigators
that came to the house and they told my mom that they was
looking for my nephew, and so she asked if we could get an
officer to come and have him to escort Richard, but they never
did say if they knew where he was and we never knew where he
was at that particular time.

Q. Okay. Did you talk to Richard about what had
happened?

A. No, I did not.

Q. Okay. You never talked to Richard at all?'

A. No.

Q. Okay. You never talked to him and he never told you
that he acted in self-defense that day?

A. No, he did not, When he came in, he came into the
den and he sat down and he started watching TV. About that
time the doorbell rung and Officer Gardner come in, and Officer
Gardner came into the den and began to ask Richard questions.

Q. Okay. you never told Officer Gardner that you spoke
to Richard and Richard told you that it was self-defense?

A. No, I did not.

Q. Okay. So you have no idea why Officer Gardner would say that would happen?

A. No, I do not.

RR. 6:252-54. Counsel made no objection to any portion of that testimony.

After Guy Nickleson testified in the State's case in chief, Lt. Roy Gardner testified for

the State. Lt. Gardner was a patrol supervisor for the Corpus Christi Police Department and

had been with the department for 32 years at the time of trial. RR 6:272. Gardner testified in

part as follows,

> Q. Specifically about 5:30, what happened with regards
> to that particular time period?
> A. At about 3:30 that day I got a phone call from
> another police officer, William Bussey. He told me that
> Troy Nickleson, which is a friend of mine, was trying to contact me.
> I called Troy and he told me that his nephew had been involved in
> a shooting or something.

>> **Garza**: "I'm going to object to whatever was told
>> to him as hearsay, Your honor.
>> **Flynn**: Your Honor, again, its not being offered for
>> the truth of the matter asserted but rather to explain
>> the particular officer's involvement and also will
>> be later on offering it for impeachment purposes as
>> well, Your honor.
>> **Court**: Your response?
>> **Garza**: Still its clearly hearsay.
>> **Flynn**: We're not offering it for the truth of the
>> matter asserted at this time, just to show this
>> officer's involvement.
>> **Court**: I'll overrule the objection.

> Q: Okay, go ahead.
> A: I called Troy, and he told me his nephew Richard, had been
> involved in a shooting where somebody had died. He asked if I
> would be willing to go over to his mother's house on Peabody
> and pick up Richard, that Richard wanted to turn himself in

*      *      *      *

> A. . . . I also called Guy on my way there to let him
> know I was coming, and Guy advised me that they were there
> at the house and also advised me, you know, that Richard was
> involved in a shooting and that to them, it appeared to be
> self-defense from what Richard had told them and that Richard
> wanted to go down to the police station and turn himself in.
> Q. Okay, Let me ask you this, Guy made it very clear on
> the phone that he talked to Richard about the case?
> A. Yes.
> Q. And that it was self-defense is what he was telling
> you?

8

A. That's correct.

Q. Okay. What happened next once you arrived at the scene?

A. I got there at the address on Peabody. I think Guy was outside, and I walked up and he took me inside the house and I think Richard's mother, grandmother was there. Richard was sitting there. There was another lady there also, and the first thing I did, I gave Richard his Miranda Warnings. I asked him if he wanted to go down to the police station. He said, "Yes." I asked him, you know, where was the gun that was involved. He said he didn't have a gun . . . .

Id., pp. 273-74.

The State rested after Lt. Gardner's testimony. The next day, during the defense case in chief, trial counsel called Linda Nickleson, Guy Nickleson, and Troy Nickleson to testify. Linda Nickleson testified that she is Richard Nickleson's mother, that Richard left the house that morning and she didn't see him again until around 3:30 that afternoon. Earlier that day, she had been at her mother's house on Palm when police officers came to the house. The officers were looking for Richard. They told her that someone had been shot and Richard had done it. She asked whether the person was still alive and the officers told her that he died. RR 7:4-6. Later that day, when she saw Richard, she told him that the police officers told her that he had killed a man and she told him he needed to turn himself in. Id. at p. 8. Richard responded that he would, but that he didn't do it. Id. He did not discuss the shooting further with her or in her presence. Id. at p. 9.

Guy Nickleson testified he got a call from his sister, Linda Nickleson, while he was at church. She told him that there were 5 or 6 police units outside with guns drawn. Guy left church and went to his mother's house. By then the police were gone. His sister told him the police were looking for Richard. Then several detectives came to the house and they were also looking for Richard. Richard's grandmother asked if Troy or Guy could get hold of someone. About thirty minutes later, Troy Nickleson called and our mother asked him to find one of the officers we knew. RR 7:18-19. The officers advised the family that they were looking for Richard because they thought he was involved in something very serious. Id. at p. 20. Guy Nickleson's further testimony was,

> Q. Okay. So then when Richard shows up at your mother's
> house, did you engage him in any sort of a conversation about,
> "Hey, Richard, what is going on? Do you want to sit down? Do
> you want to talk to me about this?"
> A. No. Matter of fact, when he came to the house, like
> I had said yesterday, when he had came to the house, he
> immediately went into the back room and sat down in the den,
> and about that time that Officer Gardner had got there and then
> the officer -- We let him in and brought him back to the den
> where Richard was because we knew that he was going to do
> whatever he needed to do to make sure Richard's safety was
> taken.

Id. at p. 21.

> Q. Okay. Officer Gardner testified yesterday that
> basically he had one telephone conversation with you at which
> time you said something to the effect that out of your family's
> concern, you wanted him to come in and assist y'all in
> basically taking Richard down to the police station and that
> he, that Richard had advised y'all that it was done in
> self-defense and that that's exactly what you related to
> Officer Gardner. Would he be correct in that assessment?

10

A. I did not speak to Officer Gardner on the phone at
1. My brother, Troy, made that phone call to him. I spoke
to Officer Gardner in escorting him back to where Richard was
when he got there at the home so, no, we did not have that
conversation on the telephone.
Q. Now there is another, there is another part of his
testimony where you met him outside, I guess, your mother's
house to sort of escort him or greet him and bring him into the
house, and he says that at that time, that's another time you
also reiterated again something about this matter having been
done in self-defense. Do you remember anything about that?
A. And, again, we didn't go into any long conversation.
I just told him that Richard was back there in the den and I
escorted him through the house. It was never ever mentioned
from me that this is what was happening because at that point I
still didn't know what was going on, so it would have been
ludicrous for me to even say that this is what is going on when
I still didn't have any clear picture of what was happening.
All I wanted to do was make sure that my nephew was safe and
escorted safely.
Q. Did Richard, I mean, did you at any time try
to engage Richard in any kind of conversation about, you know,
hey, or did anyone else in your presence by your family, did
anyone engage Richard and ask him, "Hey Richard, what's going
on?"
A. No, we did not because basically, like I said, he
came in and sat down and there was just a short period of time
before Officer Gardner showed up and we just figured that he
will, he will take it from there, and that's where we left it
at.

Id. at pp. 21-23.


2.  *Claim that Counsel should have kept Lt. Gardner's testimony regarding the
alleged admission by Richard Nickleson out of evidence*

Richard Nickleson claims that counsel provided ineffective assistance of counsel by

not filing a pretrial motion to prevent Lt. Gardner's hearsay testimony. Trial counsel Edward

Garza provided an affidavit in the state habeas proceedings. Garza testified that he attempted

11

to speak to Lt. Gardner before trial, but Gardner refused to speak to him about the case. WR-68,461-03 at p. 27. Counsel also stated that Guy Nickleson warned him before trial that Lt. Gardner might say something about an alleged admission recited by one of the uncles. Counsel stated that he planned to address the issue by hearsay objection at trial and by having Guy Nickleson testify at trial. He believed that Nickleson was as credible a witness as Lt. Gardner. Id. He did not file a motion to suppress as a matter of trial strategy. Id.

During trial, counsel objected to the prosecutor's questioning of Lt. Gardner, but his hearsay objection was overruled when the State offered the initial portions of the testimony for a limited purpose. Counsel did not renew his objection, nor did he request a limiting instruction when the testimony continued past the initial offering. During this Court's hearing, counsel for the State argued that Lt. Gardner's hearsay testimony of what Troy Nickleson allegedly repeated from Richard Nickleson was not much different than Richard's admission that "someone was shooting at him," to people near the scene of the shooting. Richard's admission had already been heard by the jury.

Lt. Gardner reported in one place that Troy Nickleson, "told me his nephew Richard, had been involved in a shooting where somebody had died." RR 6:273. In another place, Lt. Gardner reported that Guy Nickleson told him that Richard had discussed being involved in a shooting, but to Guy Nickleson, it sounded like self-defense. Id. at p. 275.

—

A decision whether to object to evidence is generally an issue of trial strategy that cannot be second-guessed, even if there is a meritorious objection. Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993). Counsel indicated that he preferred to avoid looking like he was trying to hide anything from the jury. He  reasonably could have feared that result, especially when his previous objections had all been overruled by the trial court. Given this Court's doubly deferential review, this Court cannot say that counsel's decision not to continue objecting, after being overruled by the trial court, fell so far below reasonable professional standards that the trial court's failure to find an issue constituted "an unreasonable" application of federal law.

### 3.  *Counsel's failure to object to misleading and incorrect argument by the State and to object to the State's vouching for Lt. Gardner*

During closing, the Prosecutor argued in part,

> They trusted this particular officer, and what did this officer get up here and testify? He said the family did talk to the Defendant, told him it was self-defense. That's what they told Officer Gardner. When you look at this case and when you look closely at this particular case, you will see that this is an officer with 32 years of experience, has no reason to lie. . . . He had no input involving this case. He was called by the family. There's no reason for him to lie about what Guy Nickleson told him. There's no reason to.

RR 7:53.

The Fifth Circuit Court of Appeals defines vouching as "explicit personal assurances [by a prosecutor] of a witness' veracity. United States V. Heath, 970 F.2d 1397, 1404-05 (5th Cir. 1992). Although a prosecutor may not vouch for the state's witnesses, a prosecutor may

legitimately argue that a fair inference from the facts presented is that a witness has no reason to lie. United States v. McCann, 613 F.3d 486, 495 (5th Cir. 2010); United States v. Washington, 44 F.3d 1271, 1278 (5th Cir. 1995); United States v. Bright, 630 F.2d 804, 824 (5th Cir. 1980). Defense counsel presented two witnesses who directly contradicted an important prosecution witness, Lt. Gardner. The jury was required to determine whether Guy and Troy Nickleson's testimony that they did not make the statements attributed to them by Lt. Gardner were more credible than Lt. Gardner's testimony. The prosecutor could reasonably argue the contrast between Lt. Gardner's disinterest in the outcome as a matter of credibility in contrast to the family members' testimony.

Trial counsel also stated in his affidavit that he generally does not object during argument as a matter of trial strategy. In this case, any objection would have been meritless. The Court finds that the state court's resolution of this issue was not an unreasonable application of Strickland.

Nickleson further complains that the prosecutor misrepresented the evidence during his closing arguments. He argued that,

> 11 All the witnesses told you that they did see him at
> 12 the scene. Matter of fact, the witnesses Dena Cavazos and
> 13 Arnulfo Diaz told you he was the only one, the only one in the
> 14 street at the time. We also have the testimony from Adelita
> 15 Sanchez and Adan Sanchez that he was there at their residence
> 16 shortly thereafter, and you also heard from Gabriel Casares and
> 17 Gerald Lopez and Lisa Casares that on Pueblo Street they ran
> 18 into the Defendant. . . .

RR 7:34.

14

During closing arguments, a prosecutor is permitted to argue the evidence and reasonable inferences from the evidence. <u>United States v. Mendoza</u>, 522 F.3d 482, 491 (5th Cir. 2008). Nickleson objects that the description of Arnulfo Diaz' testimony was completely misleading.

Diaz testified that he saw a green Blazer parked in front of his house at 346 Balboa at about 10 o'clock Sunday morning May 25, 2003. RR 6:211-12. He saw two people in the vehicle before he went into the house, but he could not identify the passenger because the windows of the Blazer were tinted. <u>Id.</u> at pp. 212-13. He recalled calling 911 and telling the operator that "we had seen a person in the middle of the road and somebody else taking off." <u>Id.</u> at p. 213. When he looked outside after he heard shots, just moments after he got home, he saw the Blazer drive off swerving down the road. <u>Id.</u> at p. 214. He also saw a black person in the middle of the road and "he was the only person there on a Sunday morning in the middle of the road." <u>Id.</u>

A review of the evidence admitted at trial confirms that the prosecutor did not go beyond the permissible scope of argument. No objection would have been meritorious. Moreover, the prosecutor made these statements during the opening portion of his argument. After that, Nickleson's counsel had the opportunity to argue his view of the evidence.

Nickleson further argues that the prosecutor impermissibly argued his personal opinion that Richard Nickleson was guilty when the prosecutor said, "I'm going to tell you right now he is guilty. He's a murderer, and it's that simple." RR 7:34.

The prosecutor argued near the beginning of his closing,

23 Now I believe it's not even going to be
24 contested by the Defense that Martin Sandoval was murdered. I
25 think that point is not in dispute. What do we know? We know
1 that Martin Sandoval was shot. We know he was shot with a
2 firearm. We know that the bullet went through his back and
3 came out his front. We know that he was, in fact, murdered.
4 That's what the evidence shows you. The only real element that
5 you have to decide when you go back to the jury room, the only
6 element in dispute is element number one. The Defendant in
7 this case, Richard Nickleson. That's what you have to decide,
8 whether or not Richard Nickleson is responsible for the death
9 of Martin Sandoval, and we brought witnesses here to testify to
10 the fact the Defendant is responsible for the death of Martin
11 Sandoval.
                    *       *       *       *
18  . . . . Now, Mr. Garza is going to get an
19 opportunity to speak to you about this case, and he's going to
20 try to tell you why this Defendant is not guilty, but I'm going
21 to tell you right now he is guilty. He's a murderer, and it's
22 that simple.

RR 7:33-34.

In context, it appears that the prosecutor was not stating his personal opinion, but was instead arguing that the evidence showed that Richard Nickleson was the person who murdered Martin Sandoval. That argument is not improper and there was no reason for counsel to object. Instead, defense counsel argued the evidence and why it did not prove that Richard Nickleson was guilty beyond a reasonable doubt. RR 7:35-37. The state court did not apply Strickland in an unreasonable manner when it denied relief on this issue.

3. *Cumulative error*

During argument, counsel appointed for Nickleson argued that Nickleson's claims when read liberally as *pro se* claims must be, also fairly raised the issue of cumulative error. He argued that although each of Nickleson's claims individually might constitute harmless error, the totality of them resulted in an unfair trial in violation of Nickleson's due process rights. The State objects on the ground that the claim is unexhausted because it was not raised in the state habeas.

"[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Delgado, 672 F.3d 320, 343 (5th Cir. 2012). "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" Id. at 344 (quoting Derden v. McNeel, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc). Cumulative error is especially uncommon where the government presents substantial evidence of guilt. Id. "The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional rights." Id. Stated another way, cumulative error necessitates reversal only when errors "so fatally infect the trial that they violated the trial's fundamental fairness." United States v. Delgado, 672 F.3d 320, 344 (5th Cir. 2012). Additionally, "federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved

17

matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." Derden, 978 F.2d at 1454 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Coble v. Quarterman, 496 F.3d 430, 440 (5th Cir. 2007).

In United States v. Riddle, 103 F.3d 423 (5th Cir. 1997), the Circuit Court reversed based upon cumulative error in the district court's admission of evidence at trial. The district court allowed a bank examiner to exceed the limits of lay witness testimony, excluded the defense expert, abused its discretion in admitting reports from the Office of Comptroller of the Currency about banks controlled by the defendant, and improperly admitted extraneous bank loans and a letter and memorandum that connected the defendant with numerous criminals and criminal scenarios. Id. at 434.[2] The Fifth Circuit likewise reversed for cumulative error in United States v. Houston, 481 Fed. App'x. 188, 195 (5th Cir., July 18, 2012) (per curiam) (designated unpublished).

---

[2]     Turning these rulings in a different direction would have produced a very different trial. Instead of hours of testimony about extraneous loans, Professor Huber would have given his opinion that Riddle and TNB–W operated in the way that any bank would have operated. Instead of reading the OCC's and Dixon's claims that Riddle violated banking regulations, the jury would have focused on the narrow question of Riddle's intent when he kept silent about his interest in the Vernon participations. Looking at the cumulative effect of the errors, we are persuaded that they are not harmless and require a new trial.

Id. at 434-35.

In Houston, the defendant was charged with possession of a firearm, a shotgun, by a convicted felon. The Fifth Circuit identified the following errors that cumulatively required reversal, an erroneous jury charge on constructive possession, the district court's refusal to give an alibi instruction in the jury charge, erroneous admission of two misdemeanor convictions, and the erroneous admission of the confession of the deceased alleged accomplice in violation of the Confrontation Clause. The court held that the combination of error prejudiced Houston's ability to argue his case to the jury. Id.

> [A]ll of the errors here caused confusion and prejudice that reached to the heart of the case—the identity of the perpetrator on August 15. Allowing the jury to find "constructive possession" on August 21 without regard to whether Houston "possessed" the shotgun on August 15 completely changes the case from identity at the time of the robbery—the indicted count that Houston defended—to control of the garage and its contents on August 21—a wholly separate (and unindicted) issue.

Id.

The Houston court held that while reversal will not occur when evidence of guilt is strong, in that case the evidence was "not strong enough to overcome the aforementioned cumulative error." Id. at 195.

Evidence of Richard Nickleson's guilty was circumstantial, except for the testimony of Lt. Gardner. Witnesses placed Nickleson in the neighborhood at the time of the shooting. A witness placed him in the vehicle with the deceased within half an hour of the shooting. Witnesses saw a large black man in a predominantly Hispanic neighborhood moments after the shooting, walking away from the scene. Three other witnesses who gave Richard Nickleson a ride noted his apparent dismay at seeing police cars near where he told them he

wanted to go. Admitted at trial was Lt. Gardner's testimony that his uncles allegedly told Gardner that Richard admitted to being involved in the shooting and Richard Nickleson's admission to acquaintances at 342 Balboa that someone was shooting at him.

Considering the claimed errors in Richard Nickleson's trial, 1) the use of Nickleson's prior felony conviction that the trial court instructed the jury to disregard, 2) the admission of  testimony by Lt. Gardner, that was offered in part for a limited purpose, 3) the admission of testimony, over defense objection, that Richard gave a rock of cocaine to the victim that morning, and 4) the allegedly ineffective assistance of counsel regarding the State's closing argument,  the individual issues were primarily issues of state evidence law and did not so infect the entire trial that the resulting conviction violates due process. As a result, this Court does not find cumulative error.

## CONCLUSION

The Court overrules Nickleson's objections to the M&R and adopts the M&R (D.E. 13) in part. The Court adopts the M&R on all grounds except Nickleson's claims for ineffective assistance of counsel as to the testimony of Lt. Gardner and the prosecutor's closing argument, and the recommendation that a certificate of appealability be denied.

Although after considering the claims raised by the supplement to the state habeas record, this Court does not find that Nickleson is entitled to relief, the Court believes that reasonable jurists could disagree on the resolution of Nickleson's claims, including the claim of cumulative error. The Court grants Nickleson a certificate of appealability on each of the claims raised.

It is so ORDERED this 21st day of January 2014.

HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE

21